**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BARBARA M. DAVIS,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **No. 13-6864** |
| **SOUTHEASTERN PENNSYLVANIA** | : | |
| **TRANSPORTATION AUTHORITY,** | : | |
| | : | |
| **Defendant.** | : | |

**Goldberg, J.**                                                                            **January 8, 2016**

<u>**MEMORANDUM OPINION**</u>

This case involves claims against the Southeastern Pennsylvania Transportation Authority ("SEPTA") for gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, <u>et. seq.</u>[1]  Plaintiff, Barbara M. Davis, seeks damages for an alleged hostile work environment created by three of her co-workers, and retaliation by an immediate supervisor. SEPTA has filed a motion for summary judgment, which, for the reasons that follow, will be granted.

**I.     <u>FACTUAL AND PROCEDURAL HISTORY</u>** [2]

Plaintiff was hired as a Police Officer for SEPTA on June 17, 2005. She worked there continuously up through the filing of this action. Plaintiff's claims for gender discrimination are based on an alleged hostile work environment, and stem from the conduct of three fellow police officers: James Pearlingi, Richard Cavallaro, and Dave Szlachta.

---

[1] Plaintiff also brings claims under the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 955, <u>et. seq.</u>, which also prohibits discrimination in employment based on sex and retaliation. The PHRA is construed consistently with Title VII. <u>Wilkerson v. New Media Tech. Charter Sch. Inc.</u>, 522 F.3d 315, 318 (3d Cir. 2008). Therefore, my analysis will focus on Title VII, but applies equally to Plaintiff's PHRA claims.

[2] The following facts are undisputed, unless otherwise noted.

The first incident Plaintiff points to occurred on November 13, 2006. While on patrol, Plaintiff observed fellow officer James Pearlingi at a SEPTA cashier booth. Plaintiff asked Pearlingi what he was doing at the booth because he was not assigned to that location. According to Plaintiff, Pearlingi stated to the cashier, "That dumb bitch is going to get herself shot." (Compl. ¶ 12.) Pearlingi's comment was apparently in reference to the fact that Plaintiff was holding an umbrella in her "shooting hand." (Davis Dep. 115:18–20; Pl.'s Ex. 35.) The cashier relayed Pearlingi's comment to Plaintiff as she did not hear it directly. Plaintiff subsequently reported Pearlingi to her supervisor at the time, Sgt. Darryl Simmons. She also filed a written grievance with SEPTA on November 19, 2006, regarding this incident. (Pl.'s SOF ¶ 4; Def.'s Ex. 12.) SEPTA does not dispute that Pearlingi made this comment.

In a disciplinary memorandum, Sgt. Simmons instructed Pearlingi that his comment was offensive, based on Plaintiff's gender, and constituted a violation of SEPTA's sexual harassment policy. (Def.'s Ex. 13.) SEPTA's disciplinary records further establish that Pearlingi was issued a three-day suspension from duty as a result of this incident. (Pl.'s Ex. 39.) Despite these records, Plaintiff alleges that Pearlingi was never disciplined for his comment. (See Pl.'s SOF ¶ 9.) Plaintiff does not allege any further specific instances of misconduct involving Pearlingi after this November 2006 incident.

In January 2010, approximately three years later, Plaintiff was transferred into SEPTA's K-9 Unit, where she remained through the filing of this litigation. (Davis Dep. 137:2–4.) Plaintiff was the only female in the K-9 Unit. (Horn Dep. 77:20–23.)

That same month, Plaintiff alleges that Officer Dave Szlachta made at least one telephone call to her while she was in Texas for a police training exercise, and made sexually suggestive

comments insinuating he wanted to be her "friend." Plaintiff claims that Szlachta stated the two would be "doing it up" if he was in Texas with her.[3] (Pl.'s SOF ¶ 26.)

On July 7, 2010, Szlachta placed a "club lock" on a shared police department vehicle steering wheel, which prevented Plaintiff from using it that day. (Davis Dep. 188:18–21.) Szlachta received a written reprimand from SEPTA management instructing him not to repeat that behavior. (See Def.'s Ex. 25, 26.)

In early June 2011, Szlachta made a comment in front of a group of officers, which included Plaintiff, that he was "hung like a caterpillar," referring to the size of his penis. (Davis Dep. 141:7–11.) SEPTA maintains the comment was meant as a self-deprecating joke, and was not specifically directed at Plaintiff as the other officers in the group were male. (Def.'s Mot. Summ. J. 17.) Plaintiff, however, alleges that Szlachta made similar comments in front of her on other occasions, and she found their sexual nature to be offensive.[4] (Davis Dep. 141:18–21; 142:21–23; 145:1–22.)

Additionally, on at least four separate occasions, while Plaintiff and Szlachta were engaged in training exercises together in a TSA explosives bunker, Plaintiff alleges Szlachta made comments to her suggesting the two should engage in sexual relations. (Davis Dep. 158:8–12.) Specifically, Plaintiff alleges Szlachta said something to the effect of, "Wouldn't it be real nice if we did it in here?" (Compl. ¶ 21.) Additionally, Plaintiff explains that to access the bunker, the pair had to unlock a padlock. Plaintiff alleges each time she began unlocking the padlock, Szlachta said in a sexually suggestive voice, "[C]ome on Barb, what did you forget how to do this? You put it in and pull out." (Davis Dep. 144:13–14.) Plaintiff did not specify the exact

---

[3] Plaintiff stated Szlachta called her on other occasions, but only describes one conversation in which she actually answered his call and spoke with him. (Davis Dep. 135:19–24.)

[4] While Plaintiff does not discuss these other occasions in her brief, her deposition testimony lists one other instance where Szlachta allegedly made a similar comment, which also occurred in front of a group of officers. (Davis Dep. 145:1–22.)

dates of these four encounters. However, given that she began working for the K-9 Unit in January 2010, and complained about Szlachta in June 2011, I conclude that these incidents occurred over a year-and-a-half time period.

Plaintiff alleges that in June 2011, she reported, via a telephone call, Szlachta's conduct to Lorraine McKenzie, Director of SEPTA's Equal Employment Office. Plaintiff claims McKenzie said she would call Plaintiff back, but never returned her call. (Pl.'s SOF ¶ 33.) This fact is in dispute as McKenzie did not recall receiving any informal or formal complaint from Plaintiff regarding Szlachta.[5] (McKenzie Dep. 27:1–6; 28:8–12; 38: 19–21.)

Plaintiff also claims she informed her immediate supervisor, Sgt. Evan Horn, about Szlachta's conduct. On June 10, 2011, Sgt. Horn contacted Lieutenant Chuck Lawson, and advised him of Plaintiff's concerns. (See Pl.'s Ex. 45.) On June 13, 2011, Lt. Lawson spoke directly with Szlachta about his conduct, gave him a copy of SEPTA's sexual harassment policy, and warned Szlachta that any further infractions could subject him to discipline. Sgt. Kevin Mahoney, another supervisor, sat down separately with Szlachta approximately three weeks later, discussed Szlachta's conduct, and provided him with a second copy of SEPTA's sexual harassment policy. (See Def.'s Ex. 14.) Lt. Lawson then sent a memorandum to Chief Richard Evans summarizing the conversations that both he and Sgt. Mahoney had with Szlachta about his behavior. Id.

Plaintiff also alleges that, in July 2011, Szlachta told two other officers that he would "shoot out" Plaintiff's tires if she ever let her police dog urinate on Szlachta's tires. (Davis Dep.

---

[5] McKenzie did state during her deposition that Plaintiff may have spoken with another employee in the Equal Employment Office, but McKenzie did not believe the conversation pertained to Plaintiff's claims of sexual harassment because McKenzie felt her employees within the EEO would have instructed Plaintiff to file a formal complaint had that been the case. (McKenzie Dep. 27:22–24.)

166:2–19.) Plaintiff did not hear Szlachta make this comment. Rather, one of the officers to whom Szlachta allegedly made the comment informed Plaintiff of what Szlactha had said. Id.

Plaintiff further alleges that on the morning of July 14, 2011, fellow Officer Richard Cavallaro referred to Plaintiff as a "fucking bitch" during roll call in front of a group of officers. (Pl.'s SOF ¶¶ 34, 38.) Plaintiff and Cavallaro worked for different units,[6] and thus Plaintiff was not present at the roll call meeting, nor did she actually hear Cavallaro make the comment. However, another officer relayed Cavallaro's statement to Plaintiff later that evening. In another instance involving Cavallaro, also occurring on July 14, 2011, but later in the day, Cavallaro allegedly told Plaintiff to "shut the fuck up" after she told him to calm down while the two were responding to a call. (Pl.'s SOF ¶ 40; Def.'s Ex. 16.)

Plaintiff argues SEPTA took no formal disciplinary action against Officer Cavallaro based on these two incidents. In his deposition, Sgt. Evan Horn, the supervisor on duty that morning overseeing roll call for Cavallaro's unit, acknowledged that he did not institute formal disciplinary proceedings against Cavallaro. (Horn Dep. 31:19–25; 32:1–3.) Instead, Horn stated that he "counseled" Cavallaro and informed him that such statements were unacceptable. Id. at 30:15. Cavallaro also acknowledged during his deposition that he received "counseling reinstruction" after his comments, and that Sgt. Horn told him to "act professional or [he] was going to be removed from the Unit." (Cavallaro Dep. 23:4–23; Pl.'s Ex. 30.)

Regarding the second incident wherein Cavallaro allegedly told Plaintiff to "shut the fuck up," Sgt. Horn instructed Plaintiff to "put [her complaint] on paper" so that he could run it up the SEPTA chain of command. (Horn Dep. 61:18–20.)  Plaintiff subsequently filed a written complaint with SEPTA regarding Cavallaro. (Pl.'s Ex. 5.) SEPTA did not institute formal

---

[6] Plaintiff worked in SEPTA's K-9 Unit, whereas Cavallaro worked in SEPTA's "SORT" Unit. While Plaintiff and Cavallaro did not work together directly, occasionally their paths crossed if one had to provide back up for the other. (Davis Dep. 261:2–8.)

disciplinary action against Cavallaro beyond Sgt. Horn's verbal warnings that he act more professional, and that his behavior would be closely monitored. Id.

In September 2011, Plaintiff filed another written grievance because fellow officer Szlachta allegedly placed a hidden razor blade inside the cap of a water bottle located in the K-9 Unit's communal refrigerator. Plaintiff cut her hand while using the water bottle to hydrate her police dog. Szlachta denied hiding the razor blade in the water bottle. However, SEPTA conducted an internal investigation into the incident, which included interviewing multiple officers about their knowledge and Szlachta's possible involvement. SEPTA ultimately concluded Szlachta was responsible for placing the razor blade in the water bottle, and terminated his employment on November 21, 2011.[7] (See Pl.'s Ex. 10.)

On January 9, 2012, Plaintiff's immediate supervisor, Sgt. Evan Horn, informed her that Cavallaro had stated she had yelled at him during a call on one of their previous shifts. (Davis Dep. 254:14–15.) Plaintiff disputed Cavallaro's account of the encounter, and explained to Sgt. Horn she believed Cavallaro was attempting to "reverse" things in order to essentially get back at her for the previous complaint she filed against him. Id. at 254:18–19. Plaintiff alleges Sgt. Horn responded by saying, "[L]isten, you two better get along because otherwise you're both going to be bounced from the unit." Id. at 255:1–3. Horn's statement forms the basis for Plaintiff's retaliation claim.[8] Horn denies that he used this specific language. Rather, his account suggests

---

[7] SEPTA subsequently reinstated Officer Szlachta after he successfully appealed his termination to SEPTA's Labor Relations Board. (See Pl.'s Ex. 53.) However, he was again terminated due to events unrelated to this litigation, and his second appeal for reinstatement was denied.

[8] Plaintiff subsequently alleged in her brief in opposition to SEPTA's motion for summary judgment that Sgt. Horn further retaliated against her when a fellow officer's gun accidentally discharged, and Horn blamed it on Plaintiff. (Pl.'s Resp. 21; Davis Decl. ¶¶ 31, 32.) Plaintiff did not include this allegation in her complaint, nor did she seek leave to file an amended complaint. Therefore, I must disregard this after-the-fact allegation as it is impermissible for a plaintiff to expand upon her claims at the summary judgment stage. See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) ("We caution that without some factual allegation in the complaint, a claimant cannot satisfy the [Rule 8] requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests."); Dewees v. Haste, 620 F. Supp. 2d 625, 635 n. 7 (M.D. Pa. 2009) ("Federal pleading standards do not

he simply wanted all of the officers to get along, and if that was not possible, transferring certain officers could be necessary. Horn denies that he specifically singled out Plaintiff. (Horn Dep. 87:1–7.)

On November 26, 2013, Plaintiff filed her complaint alleging: gender discrimination in violation of Title VII ("Count I"); gender discrimination in violation of the PHRA ("Count II"); retaliation under Title VII ("Count III"); and retaliation under the PHRA ("Count IV"). (Compl. ¶¶ 35-46.)  Plaintiff seeks back pay, compensation for lost earnings for using earned sick days as a result of stress and anxiety stemming from these incidents, and other compensatory damages relating to her emotional distress.

SEPTA filed its motion for summary judgment on March 16, 2015, arguing that Plaintiff's claims must be dismissed because she has failed to establish both a prima facie case of gender discrimination (hostile work environment through sexual harassment) and retaliation under Title VII and the PHRA.  For the reasons that follow, I will grant SEPTA's motion.

## II.    <u>LEGAL STANDARD</u>

A party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact in dispute, and that judgment is appropriate as a matter of law.  Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once a properly supported motion for summary judgment has been made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).  An issue is "genuine" if a reasonable jury could rule in favor of the non-moving party based on the evidence presented.

---

allow a party 'to raise new claims at the summary judgment stage.'").  Plaintiff's Declaration also states that Cavallaro made other offensive comments to her in January 2012. Plaintiff's Declaration was executed on April 4, 2015. These allegations do not appear in her complaint, nor does she cite to them in her brief. Accordingly, these allegations do not constitute part of the summary judgment record. <u>Carr v. Gillis Associated Indus., Inc.</u>, 227 F. App'x 172, 176 (3d Cir. 2007) ("District Courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour.").

Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  A factual dispute is "material" if it might affect the outcome of the suit under the appropriate governing law. Id. at 423. The non-moving party cannot avert summary judgment with speculation or conclusory allegations, but rather must cite to the record.  Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999); Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the court considers the evidence in the light most favorable to the non-moving party.  Anderson, 477 U.S. at 256.

### III.   DISCUSSION

#### a.  Plaintiff's Hostile Work Environment Claim

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff may establish a violation of Title VII by proving that sexual harassment created a "hostile work environment." Huston v. Proctor & Gamble, 568 F.3d 100 (3d Cir. 2009).

To establish a prima facie case of sex discrimination based on a hostile work environment, a plaintiff must show that (1) she suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable employee of the same sex in that same position; and (5) respondeat superior liability. Miller v. Thomas Jefferson Univ. Hosp., 565 F. App'x 88, 93 (3d Cir. 2014) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)). "The first four elements establish a hostile work environment, and the fifth element determines employer liability." Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167

(3d Cir. 2013). I will review each element separately, along with the facts of record, viewing these facts in the light most favorable to Plaintiff.

i.   Intentional Discrimination Because of Sex

A plaintiff must first demonstrate that the alleged discriminatory conduct was because of her sex. Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998). Workplace harassment, even harassment between men and women, is not automatically discrimination because of sex merely because the words used have sexual content or connotations. Id. at 80. The critical issue is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."  Id. at 80. Therefore, the proper inquiry for this element is whether a reasonable factfinder could view the evidence as showing that a plaintiff's treatment was attributable to her sex. Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 277 (3d Cir. 2001). Sexual harassment need not be motivated by sexual desire or "include sexual overtones in every instance."  Oncale, 523 U.S. at 80. A court is required to undertake "a more fact intensive analysis . . . where the actions are not sexual by their very nature."  Andrews, 895 F.2d at 1482 n. 3.

Plaintiff cites to Thomas v. Town of Hammonton, 351 F.3d 108 (3d Cir. 2003) in support of her argument that use of the word "bitch" by Pearlingi and Cavallaro is evidence of sexual harassment. (Pl.'s Resp. 9.) In Thomas, the Third Circuit agreed that "bitch" may or may not be a derogatory term indicative of sex-based hostility. Id. at 118 n. 6. The court's conclusion that the plaintiff in Thomas satisfied the first prong, however, turned largely on other evidence. The alleged male harasser in Thomas was the plaintiff's instructor—a position of authority—during a 911 dispatcher training course. The instructor was alleged to have frequently used the terms "jerk-offs," "pricks," "pussies," and "bitch." Id. at 110. He also allegedly distributed "dumb

blonde" jokes to the class, grabbed his genital area several times in front of the plaintiff, purposely stood uncomfortably close to the plaintiff while he was teaching the class, and played 911 audio tapes involving sexually explicit situations that served no academic purpose. Id. at 110. The plaintiff also alleged that the instructor made comments containing sexual innuendo when the plaintiff ate a hotdog for lunch one day. Id. The court therefore concluded that a jury could reasonably interpret the instructor's conduct directed toward the plaintiff as being "because of" her sex. These facts are certainly more expansive than the allegations before me involving Pearlingi and Cavallaro.

SEPTA relies upon Spangler v. City of Philadelphia, 523 F. App'x 142 (3d Cir. 2013) in support of its argument that the alleged "bitch" comments were not based on Plaintiff's gender. (Def.'s Mot. Summ. J. 13.) In Spangler, the Third Circuit affirmed the district court's grant of summary judgment in favor of the City of Philadelphia, and agreed that the female plaintiff failed to make out a prima facie case of discrimination based on the conduct of her male supervisor. Spangler, 523 F. App'x at 146. The plaintiff was employed with the Crime Scene Unit of the Philadelphia Police Department. One of her male supervisors, a Captain within the Department, allegedly referred to the plaintiff as a "bitch" outside of her presence on at least one occasion. Id. at 144. The Third Circuit reasoned that, despite the "reprehensible nature of this language, insults in the workplace do not constitute discrimination 'merely because the words used have sexual content or connotations.'" Id. at 146 (citing Oncale, 523 U.S. at 80).

The facts of the case before me are more analogous to Spangler than Thomas.[9] Therefore, I conclude that, as a matter of law, Pearlingi's reference to Plaintiff as a "dumb

---

[9] A survey of other cases within this circuit does not reflect uniform results with respect to whether "bitch" does or does not constitute sexual harassment. However, it appears that where a plaintiff can articulate other instances of explicit sexual harassment, that word can reasonably be interpreted as *further* evidence of sexual harassment. See e.g., Ivan v. Cnty. of Middlesex, 595 F. Supp. 2d 425, 455 (D.N.J. 2009) (noting that the term "house bitch" could

bitch," and Cavallaro's statement that he wanted SEPTA management to "keep that fucking bitch" away from him—both of which occurred outside Plaintiff's presence—do not constitute intentional discrimination because of her sex.[10] Similarly, Cavallaro's statement that Plaintiff "shut the fuck up" does not give rise to an inference of intentional discrimination because of Plaintiff's sex. All three comments are more appropriately characterized as isolated, offensive epithets. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986). These statements constituted a disregard for the professionalism required of police officers. However, Title VII protects against intentional discrimination because of one's sex. It does not protect against all insults or personal animosity in the workplace. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

The remainder of Plaintiff's hostile work environment claim is premised on the alleged misconduct of Szlachta. SEPTA again argues that the majority of Plaintiff's allegations do not constitute discrimination based on Plaintiff's sex.

---

be interpreted as contributing to a hostile work environment because the plaintiff's male supervisor used the term in conjunction with various other sexually explicit phrases); Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013) (noting that the female plaintiff's male supervisor's repeated reference to the plaintiff as a "fucking bitch," coupled with various other sexually explicit statements, could give rise to the inference that he used the term because of the plaintiff's gender). But where, as here, the word "bitch" makes up majority of the alleged misconduct, courts have concluded that this context more appropriately supports the inference that its use was merely an offensive epithet, and not based on sex. See e.g., Kidd v. Com. of Pennsylvania, 37 F. App'x 588, 593 (3d Cir. 2002) (noting that a supervisor's one-time use of the word "bitch" during an argument with the plaintiff was not sexual harassment); Reyes v. McDonald Pontiac GMC Truck, Inc., 997 F. Supp. 614, 617 (D.N.J. 1998) ("Name calling and loud arguments do not constitute a sexual harassment claim. The fact that [plaintiff's co-worker] referred to plaintiff on two occasions as a 'bitch' or 'Miss F****** Queen Bee' does not show that she was discriminated against because of her sex. Was [the co-worker] rude? Yes. Were [the co-worker's] comments inappropriate in an employment setting? Yes. But that is all they were. Sometimes words of frustration and anger are only meant in that spirit."); Koschoff v. Henderson, 109 F. Supp. 2d 332, 336 (E.D. Pa. 2000) (concluding use of the word "bitch" was not specifically motivated by the plaintiff's sex).

[10] Plaintiff also argues that Pearlingi's comment referring to Plaintiff as a "dumb bitch" violated SEPTA's sexual harassment policy, and resulted in his suspension. However, it is not SEPTA's sexual harassment policy under which Plaintiff seeks to impose liability—it is Title VII. And "interpretation of [a] defendant's internal sexual harassment policy is irrelevant to the question of its liability under Title VII." Bonora v. UGI Utilities, Inc., WL 1539077, at *5 (E.D. Pa. Oct. 18, 2000).

Plaintiff cites to SEPTA's "K-9 Investigation" report stemming from its investigation into the razor blade incident in support of her allegations that Szlachta specifically targeted her, and that SEPTA failed to discipline him. (See Pl.'s Resp. 8; Pl.'s Ex. 46.) The report includes nine interview transcripts, including those of Plaintiff and Szlachta. While Plaintiff argues Szlachta specifically targeted her, other officers' testimony reveals the refrigerator in which Szlachta placed the water bottle was a communal refrigerator. With the exception of Szlachta, all of the officers in the Unit shared the water bottles. Szlachta began marking a water bottle "K4" and had indicated to a fellow officer that he was tired of other officers using that particular water bottle, which he apparently designated as his own. (Pl.'s Ex. 46, pp. 4–7; Pl.'s Ex. 70.)

In short, any of the officers in the K-9 Unit could have reached for that water bottle. Officer Thomas Mercier stated during his interview that he had previously placed water in that same refrigerator, and he could have been the one that cut himself, or anyone else in the Unit for that matter. Id. at 4. Plaintiff's deposition testimony also acknowledges that all of the K-9 handlers shared the water bottles in the refrigerator. (Davis Dep. 170:3–4.) SEPTA's notice of termination to Szlachta stated that he "knowingly and intentionally [placed] a razor blade in the cap of the water bottle which he left in the refrigerator with the intent of causing harm to any unsuspecting individual who may have tried to open it." (Pl.'s Ex. 10, p. 4) (emphasis added). Therefore, the record evidence cannot support the inference that Plaintiff was intentionally discriminated against because of her sex when Szlachta hid the razor blade in the water bottle. Oncale, 523 U.S. at 80. This conclusion does not diminish the seriousness of Szlachta's misconduct; however, such conduct must be viewed within the context of Title VII's requirements.

As for Szlachta's apparent threat to shoot out Plaintiffs tires, the record is underdeveloped regarding this allegation. Plaintiff mentions it only briefly in her complaint without providing any context, nor does she discuss the issue in her response in opposition to summary judgment. (Compl. ¶ 20.) Plaintiff's Statement of Disputed Facts cites to her own Declaration, but she provides no further argument, and only points out that she reported this issue to Kathleen Blankley, a detective with SEPTA's Inspector General Office. (Pl.'s SOF ¶ 28; Davis Decl. ¶ 14, 18.) There is no deposition testimony from Ms. Blankley in the record. When asked during her deposition about this allegation, Plaintiff acknowledged that she did not hear Szlachta make this apparent threat, but only gained knowledge of this information through two other officers. (Davis Dep. 166:4–5.) Given the lack of evidence on this issue, a reasonable jury could not conclude that Szlachta made this statement because of Plaintiff's sex. Connell v. Nicholson, 318 F. App'x 75, 78 (3d Cir. 2009).

Lastly, regarding Szlachta's alleged comment that he was "hung like a caterpillar," there is insufficient evidence in the record to suggest that Szlachta made this comment because Plaintiff is female. Szlachta apparently made this comment in front of a group of officers, most of whom were male. Therefore, the record evidence does not support an inference that this comment exposed Plaintiff to "disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed." Oncale, 523 U.S. at 80.

A reasonable jury could, however, conclude that the remaining conduct involving Szlachta does implicate Plaintiff's sex. Indeed, SEPTA does not dispute that the phone call Plaintiff received from Szlachta while she was in Texas was sexual in nature. (Def.'s Mot. Summ. J. 15.) Nor does SEPTA dispute that Szlachta's comments to Plaintiff during their training sessions at the TSA bunker were based on her sex.

In addition to these occurrences, I also conclude that a jury could reasonably interpret Szlachta placing the club lock on Plaintiff's steering wheel as being motivated by her sex. SEPTA's internal disciplinary records acknowledge that Szlachta had increasingly become "fixated" on Plaintiff, and she believed that Szlachta placed the club on the steering wheel to specifically prevent her, the only female in the Unit, from using the vehicle. (See Pl.'s Ex. 46, p. 12; Davis Dep. 188:18–21; 189:19–22.) SEPTA has offered no evidence that Szlachta engaged in this type of behavior with any of his male counterparts. Thus, when viewed in the light most favorable to Plaintiff, a reasonable jury could interpret this conduct as being based on Plaintiff's sex. See Oncale, 523 U.S. at 80 (noting sexual overtones need not be included in every instance, and where sexual overtones are lacking, a more fact intensive analysis is needed); Andrews, 895 F.2d at 1485 (noting "intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances").

Having found that Plaintiff has set forth certain evidence sufficient to satisfy the first element, the next step is to determine whether Szlachta's conduct was severe or pervasive.

### ii.   Severe or Pervasive

Not all workplace conduct that may be described as harassment rises to the level of a hostile work environment. Clegg v. Falcon Plastics, Inc., 174 F. App'x 18, 24 (3d Cir. 2006). The second element of a prima facie case requires that a plaintiff's workplace be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002). The threshold for pervasiveness and regularity of discriminatory conduct is high. Greer v. Mondelez Glob., Inc., 590 F. App'x 170, 173 (3d Cir. 2014). "The disjunctive phrasing means that 'severity' and 'pervasiveness' are

alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the work place only if it is pervasive." Jenson v. Potter, 435 F.3d 444, 449 n. 3 (3d Cir. 2006).

"[S]imple teasing, offhanded comments and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim. Rather, the conduct must be extreme to amount to a change in the terms and conditions of employment." Caver v. City of Trenton, 420 F.3d 243, 262–63 (3d Cir. 2005) (citing Faragher, 524 U.S. at 788); see also Faragher, 524 U.S. at 788 (The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code'"); Brown v. Sunoco Logistics Partners, L.P., WL 1308295, at *10 (E.D. Pa. May 10, 2006) (noting "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" will not survive summary judgment).

A court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Mandel, 706 F.3d at 168 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). In other words, a hostile work environment can be "composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Morgan, 536 U.S. at 117; see also Cardenas v. Massey, 269 F.3d 251, 261-62 (3d Cir. 2001) ("[T]he advent of more sophisticated and subtle forms of discrimination requires that [courts] analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim."). Therefore, a

district court cannot parse out individual incidents, but rather must evaluate the alleged hostile work environment as a whole. Mandel, 706 F.3d at 168.

In light of this precedent, SEPTA points out that, excluding the conduct not based on Plaintiff's sex, the record only contains a few inappropriate comments and gestures made over approximately eighteen months, which do not rise to the level of being severe or pervasive.

In carefully reviewing the totality of the circumstances, I agree with SEPTA. Even when viewed in the aggregate, as I am required to do, Plaintiff has not set forth sufficient evidence to raise the inference that her employment was permeated with discriminatory intimidation, ridicule, or insult such that she experienced a change in the terms and conditions of her employment. Morgan, 536 U.S. at 116.

As noted previously, the comments made by Pearlingi and Cavallaro did not amount to discrimination based on Plaintiff's sex. [11] My analysis, therefore, will only focus on the alleged misconduct of Szlachta. Plaintiff alleges Szlachta called her in January 2010 trying to be her "friend." Szlachta made comments of a sexual nature during that phone call. Over the next eighteen months, on four separate occasions at the TSA bunker, he made comments with sexual connotations that made Plaintiff feel uncomfortable. Finally, in July 2010 he placed the club lock on their shared police vehicle steering wheel.

I conclude that, as a matter of law, this conduct does not rise to the level of being so serious such that it was severe, nor was it so regular such that it can be fairly characterized as pervasive. See e.g., Stephenson v. City of Philadelphia, WL 1804570, at *11 (E.D. Pa. June 28,

---

[11] Even if Pearlingi and Cavallaro's isolated remarks constituted intentional discrimination because of Plaintiff's sex, the result would be the same. See Trunzo v. Ass'n of Prop. Owners of the Hideout, Inc., 90 F. App'x 622, 625 (3d Cir. 2004) (noting that even if the plaintiff could prove discrimination because of her sex, which included among other things, being referred to as a "fucking bitch," this conduct would not be sufficient to satisfy the severe or pervasive requirement); see also Grassmyer v. Shred-It USA, Inc., 392 F. App'x 18, 30 (3d Cir. 2010) (concluding that the plaintiffs failed to establish a hostile work environment because their male co-worker's use of the term "bitches" in reference to women, while "sophomoric and no doubt offensive," was not severe or pervasive, even when combined with other misconduct).

2006) (granting summary judgment because nine sporadic incidents over nineteen months, which included co-workers telling plaintiff she "looked good" and should "play her cards right," while a breach of workplace etiquette, did not rise to the level of "severe or pervasive" to create a hostile work environment); but see Rorrer v. Cleveland Steel Container, 712 F. Supp. 2d 422, 428 (E.D. Pa. April 28, 2010) (declining summary judgment because a reasonable jury could conclude that a male co-worker holding a knife to the plaintiff's breast was "severe"); Grazioli v. Genuine Parts Co., 409 F. Supp. 2d 569, 578 (D.N.J. December 30, 2005) (declining summary judgment because the plaintiff presented sufficient evidence of "pervasive" harassment where, on daily basis, her male co-worker sang the "pussy song," made physical gestures of a sexual nature, used the words "fuck, "cunt," and "blowjob" in everyday conversation, commented on female employees' genitalia at least once a week, and on at least one occasion commented on the size of the plaintiff's breasts).

Plaintiff repeatedly cites to Ascolese v. SEPTA, WL 2165102 (E.D. Pa. May 22, 2008) in an effort to establish that "sexual harassment of women officers was a prevailing culture in SEPTA's Police Department." (Pl.'s Resp. 12.) The plaintiff in Ascolese was also a female police officer employed with SEPTA's police department, and filed a sex discrimination claim based on a hostile work environment. In denying SEPTA's summary judgment motion, the district court stated that a primary reason for doing so was the "plethora of disputed facts," and the fact that SEPTA waited three months to conduct its investigations into the plaintiff's claims, and ultimately reduced its punishment for one of the offending officers from a ten-day suspension to a one-day suspension. The court found that this evidence raised a genuine issue of material fact as to whether SEPTA was negligent in its response to the plaintiff's allegations. Ascolese, WL 2165102, at *8. No such facts exist here.

Plaintiff refers to Ascolese in conjunction with my discovery Order of October 30, 2014, wherein I required SEPTA to produce its EEO files "regarding its investigations of complaints of gender discrimination, sexual harassment, hostile work environment and retaliation made by other female police officers." (Doc. No. 20.) That Order limited production to complaints filed after July 1, 2010. Plaintiff argues that this discovery Order somehow creates a question of fact regarding a hostile work environment because it demonstrates a prevailing culture of sexual harassment at SEPTA. I fail to see the connection between this discovery Order, Ascolese, and the record evidence before me.

The events giving rise to the allegations in Ascolese occurred between May 2005 and March 2006—several years before the bulk of Plaintiff's allegations in the instant case. Additionally, the district court in Ascolese issued its summary judgment opinion more than two years before the July 1, 2010 discovery cut-off date that I set for the parties in the case before me. The alleged harassment in Ascolese was also perpetuated by different officers in a different unit. In short, the probative value of another claim of sexual harassment involving different officers, and occurring several years before this litigation was filed, has no bearing on the facts of the case before me.

In Hargrave v. Cty. of Atl., 262 F. Supp. 2d 393, 420 (D.N.J. May 12, 2003), the court acknowledged that evidence of harassment which has been directed at a plaintiff's co-workers may, under certain circumstances, be relevant in establishing a hostile work environment claim. However, this does not mean that a plaintiff can claim to have been victimized by every act of discrimination or harassment ever perpetrated in the workplace. "Rather, there must at least be some evidence that the plaintiff was subjectively aware of the discrimination or harassment allegedly directed at her fellow employees at some point during the course of her employment."

18

Id. at 420. Here, Plaintiff does not allege that she had any personal knowledge of the harassment in Ascolese. Plaintiff's reliance on the Ascolese case, therefore, is simply too attenuated to establish an "atmosphere of condoned sexual harassment in [the] workplace." Glass v. Philadelphia Elec. Co., 34 F.3d 188, 195 (3d Cir. 1994).

Because Plaintiff has failed to satisfy the second element of her prima facie case of sex discrimination based on a hostile work environment, summary judgment for SEPTA is appropriate.

### iii. Respondeat Superior Liability

Because SEPTA does not argue that Plaintiff failed to satisfy the third and fourth elements of her prima facie case, I will turn next to the fifth and final element—respondeat superior liability. When a hostile work environment is allegedly created by a victim's non-supervisory co-worker(s), as is the case here, employer liability "exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Huston, 568 F.3d at 100. Plaintiff does not argue that SEPTA failed to provide a reasonable avenue for complaints of harassment. Rather, she focuses her argument on SEPTA's alleged failure to properly train and/or discipline its employees after Plaintiff filed her complaints of misconduct. (Pl.'s Resp. 7–11.) SEPTA does not assert that it lacked notice of Plaintiff's complaints, which are well documented. Rather, SEPTA argues that Plaintiff's claim fails because it took prompt and remedial action each time Plaintiff complained about her co-workers. (Def.'s Mot. Summ. J. 18.)

"[T]he law does not require that investigations into sexual harassment complaints be perfect. Rather, to determine whether the remedial action was adequate, a court must consider

whether the action was 'reasonably calculated to prevent further harassment.'" <u>Knabe v. Boury Corp.</u>, 114 F.3d 407, 412 (3d Cir. 1997). Employers maintain a duty to be reasonably diligent in attempting to discover co-worker harassment, and to respond promptly and appropriately to such harassment. However, employers are not expected to know every instance of harassment that may occur between co-workers. "Such a requirement would effectively saddle employers with strict liability for co-worker harassment, contrary to the standard of negligence." <u>Huston</u>, 568 F.3d at 108. An employer can be held liable, however, "if a faulty investigation renders its subsequent remedial action inadequate, i.e., not reasonably calculated to prevent further harassment." <u>Id.</u> at 414.

Plaintiff alleges that SEPTA failed to take prompt remedial action when she complained of other officers' misconduct, or, even where it did take remedial action, it amounted to nothing more than a "slap on the wrist." (Pl.'s Resp. 12.) As previously noted, even if Pearlingi's conduct in 2006 was based on Plaintiff's sex, and thus contributed to her hostile work environment claim, the evidence of record reflects that SEPTA suspended him from duty for three days. Plaintiff alleged no specific instances of misconduct involving Pearlingi beyond that one incident. Therefore, under these circumstances, no reasonable jury could conclude that a three-day suspension—issued after an internal investigation into the alleged misconduct—was not reasonably calculated to prevent further use of profane language toward a fellow officer.[12]

---

[12] I further note that Pearlingi's involvement in this case stems solely from one statement he made in November 2006. Even if Plaintiff could make out a prima facie case of sex discrimination, her allegations involving Pearlingi are time-barred. <u>See</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002) (noting that if conduct complained of during the statutory period is completely unrelated to previous conduct outside the statutory period, a plaintiff may not recover for the previous unrelated conduct because it was not part of the same hostile work environment). Approximately 1,149 days elapsed between Plaintiff's complaint about Pearlingi in 2006 and her transfer into the K-9 Unit in 2010. Plaintiff submitted no evidence of misconduct during the intervening years. Additionally, the alleged misconduct in 2006 involved a different officer (Pearlingi) than the misconduct in 2011 (involving Cavallaro and Szlachta). Therefore, while I acknowledge that hostile work environment claims often include conduct falling outside the limitations period, the incident involving Pearlingi does not reflect a persistent, ongoing pattern of actions giving rise to a continuing violation in this case. <u>Id.</u> at 122.

With respect to Szlachta, SEPTA argues that when Plaintiff did verbally report Szlachta's "inappropriate comments of a sexual nature" to Sgt. Horn in June 2011, Horn asked Plaintiff if she wished to file an EEOC charge. (Def.'s Mot. Summ. J. 18–19.) She responded that she did not. (See Def.'s Ex. 14.) Nevertheless, Sgt. Horn reported Plaintiff's concerns up the SEPTA chain of command, and both a lieutenant and a sergeant separately sat down with Szlachta, counseled him as to the offensiveness of his comments, and provided him with two separate copies of SEPTA's sexual harassment policy. Id. Lt. Lawson spoke with Szlachta the very next business day[13] once he had been apprised of the situation by Sgt. Horn. Id. Lawson also informed Szlachta that any further incidents would not be tolerated, and would subject him to discipline. Id. at 2.

The Third Circuit has previously held that this type of remedial action constitutes an adequate response. See Andreoli v. Gates, 482 F.3d 641, 644 (3d Cir. 2007) ("We have found an employer's actions to be adequate, as a matter of law, where management undertook an investigation of the employee's complaint within a day after being notified of the harassment, spoke to the alleged harasser about the allegations and the company's sexual harassment policy, and warned the harasser that the company does not tolerate any sexual comments or actions." (citing Knabe, 114 F.3d at 413)). Therefore, I conclude that, as a matter of law, SEPTA's response to Plaintiff's June 2011 complaint regarding Szlachta's sexually-based comments was reasonably calculated to prevent further harassment.

As to the "club lock" incident occurring in July, 2010, SEPTA issued a written reprimand to Szlachta, and there is no evidence to suggest he engaged in that same behavior again. (Def.'s Mot. Summ. J. 20; Def.'s Ex. 25.) Where a plaintiff has presented "no evidence that a

---

[13] Sgt. Horn informed Lt. Lawson of Plaintiff's concerns on Friday, June 10, 2011. Lawson then spoke with Szlachta the following Monday, June 13, 2011.

nonpunitive remedial action was not reasonably calculated to end the harassment, summary judgment for an employer is appropriate." Knabe, 114 F.3d at 414.

SEPTA further argues that, even when the misconduct alleged was not based on Plaintiff's gender, SEPTA responded promptly and appropriately. (Def.'s Mot. Summ. J. 20–21.) As discussed, there is a lack of evidence suggesting the razor blade incident was carried out because of Plaintiff's gender, or was even directed at her individually. Nevertheless, SEPTA launched an internal investigation in the days that followed, interviewed several officers, and fired Szlachta once management felt reasonably confident he was the perpetrator. (Id. at 20; Pl.'s Ex. 46.) Plaintiff cites to the investigation report and findings, in which SEPTA acknowledges Szlachta's conduct had escalated during the preceding weeks. (Pl.'s Ex. 46, pp. 11–12.) Plaintiff contends this report is conclusive proof that SEPTA was negligent in its response to Plaintiff's complaints. (Pl.'s Resp. 8.) I disagree.

Much of the factual record is comprised of internal documentation from SEPTA's records that show Plaintiff's complaints were communicated to the highest levels of the organization. (See Def.'s Ex. 13; Def.'s Ex 14; Def.'s Ex. 16; Def.'s Ex. 17; Def.'s Ex. 20; Def.'s Ex. 22; Def.'s Ex. 24; Def.'s Ex. 25; Def.'s Ex. 26.) Pearlingi and Szlachta both received punishment—a three-day suspension and termination, respectively—following Plaintiff's complaints of their misconduct. Ultimately, when viewed in the light most favorable to Plaintiff, no reasonable jury could conclude that SEPTA responded with deficient remedial action that was not reasonably calculated to prevent the misconduct from reoccurring.

Finally, Plaintiff argues that SEPTA should be liable because Pearlingi was issued a three-day suspension for calling Plaintiff a "dumb bitch," while Cavallaro was merely "counseled" by Sgt. Horn for referring to Plaintiff as a "fucking bitch" and telling her later that

same day to "shut the fuck up." (Pl.'s Resp. 14.) Plaintiff is correct to point out that SEPTA's response to similar infractions—even if they occurred nearly five years apart—may be inconsistent. However, Sgt. Horn instructed Cavallaro that his statements were unacceptable, that he was to act like a professional, and that his behavior would be closely monitored. When Plaintiff verbally complained to Sgt. Horn regarding Cavallaro's statements, he instructed her to "put it on paper" so that he could run her complaint up the chain of command. (Horn Dep. 61:19–20.) To be sure, there was no shortage of personal animosity between Plaintiff and Cavallaro. Because Sgt. Horn had already instructed Cavallaro that he would be transferred from the unit if he did not modify his behavior, SEPTA management decided not to impose any further disciplinary action. While SEPTA's response may not have been perfect, the law does not require perfect remedial action so long as such action is reasonably calculated to prevent any further similar misconduct. <u>Knabe</u>, 114 F.3d at 412. Under these circumstances, no reasonable jury could find that Sgt. Horn's remedial action did not comport with this standard.

In summary, even viewing the evidence in the light most favorable to Plaintiff, she has failed to establish a prima facie case of sex discrimination based on a hostile work environment. Therefore, I will grant SEPTA's motion for summary judgment as to Counts I and II.

### b. Plaintiff's Retaliation Claim

Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of [its] employees … because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C.A. § 2000e-3(a). To establish a claim for retaliation under Title VII, a plaintiff must show that (1) she engaged in a protected activity; (2) she suffered an adverse employment action;

and (3) a causal connection between the retaliatory act and the protected activity. Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)). To survive a motion for summary judgment in an employer's favor, a plaintiff must produce some evidence, direct or circumstantial, from which a jury could reasonably reach each of these conclusions. Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

If Plaintiff can establish a prima facie case, the burden then shifts to SEPTA to articulate a legitimate, non-retaliatory reason for the adverse employment action. Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007). An employer's burden at this stage is "relatively light." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997). If SEPTA meets its burden, the burden then shifts back to Plaintiff to establish that the stated reason for the adverse employment action is false, and the real reason is a pretext for retaliation. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798 (1973). "Although the burden of production of evidence shifts back and forth, the plaintiff has the ultimate burden of persuasion at all times." Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 193 (3d Cir. 2015).

An employee "must hold an objectively reasonable belief, in good faith, that the activity [she opposes] is unlawful under Title VII." Moore, 461 F.3d at 341. However, a plaintiff's "personal opinion about what happened to [her] and why it happened is not competent evidence sufficient to defeat [a] defendant's motion for summary judgment." Davis v. Prison Health Servs., Inc., 558 F. App'x 145, 149 (3d Cir. 2014).

Plaintiff's claim for retaliation stems from a single comment allegedly made on January 9, 2012 by her immediate supervisor, Sgt. Horn, that she and fellow officer Cavallaro "get along" or else they would both be "bounced" from their units. (Compl. ¶ 28; Pl.'s Resp. 19.) Sgt. Horn disputed in his deposition that he specifically mentioned Plaintiff when discussing the

possibility of transferring certain officers. (Horn Dep. 87:1–7.) Nevertheless, SEPTA argues that even if Horn made this "unfulfilled threat," it cannot form the basis for a retaliation claim because it did not constitute an adverse employment action, nor was there a causal connection between Plaintiff's protected activity and the alleged threat. (Def.'s Mot. Summ. J. 6–9.) I will again evaluate each element separately, along with the facts of record, and viewed in the light most favorable to Plaintiff.

i.   Protected Activity

A protected activity includes formal charges of discrimination as well as "informal protests of discriminatory employment practices, including making complaints to management." Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc., 450 F.3d 130, 135 (3d Cir. 2006). There are two clauses within the anti-retaliation provision under which a plaintiff may base her claim—the "opposition clause," where an employee opposes an employment action made unlawful by Title VII, and the "participation clause," where an employee is retaliated against because she "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. §2000e–3(a). Courts interpreting the "participation clause" have held it offers much broader protection to Title VII employees than does the "opposition clause." Slagle v. Cnty. of Clarion, 435 F.3d 262, 266 (3d Cir. 2006).

A plaintiff must "allege discrimination on the basis of race, color, religion, sex, or national origin to be protected" from retaliation. Id. at 268; Daniels, 776 F.3d at 194. Vague allegations of misconduct not based on a specific protected category will not meet the "low bar" that Title VII sets for employees seeking protection against retaliation. Slagle, 435 F.3d at 268. "[C]ase law has established that opposition to an illegal employment practice must identify the

practice—if not specifically, at least by context. <u>Curay-Cramer</u>, 450 F.3d at 135. In other words, a "general complaint of unfair treatment" is insufficient to establish protected activity under Title VII. <u>Id.</u> at 135. Courts must look to the "message being conveyed rather than the means of conveyance" in determining whether a plaintiff has engaged in opposition conduct. <u>Id.</u> at 135 (citing <u>Barber v. CSX Distribution Servs.</u>, 68 F.3d 694, 702 (3d Cir. 1995)).

Plaintiff argues that she engaged in numerous protected activities when she reported the misconduct of Pearlingi, Szlachta, and Cavallaro. (Pl.'s Resp. 19.) SEPTA counters that Plaintiff's September 2011 complaint regarding the razor blade incident was not a complaint of sexual harassment, and thus did not constitute a protected activity. (Def.'s Mot. Summ. J. 8.) SEPTA further argues that Plaintiff's July 2011 complaint regarding Cavallaro made no mention of sexual harassment when he allegedly told her to "shut the fuck up." <u>Id.</u> at 8. I agree with SEPTA that these two complaints did not constitute protected activities.[14] As discussed with respect to Plaintiff's hostile work environment claim, there is a lack of evidence suggesting these incidents were attributable to Plaintiff's gender. In other words, these complaints were generalized allegations of misconduct. <u>Slagle</u>, 435 F.3d at 268. Therefore, Plaintiff's November 2006 complaint about Pearlingi, her July 2011 complaint about Cavallaro, and her September 2011 complaint about Szlachta did not constitute protected activities.

Similarly, I conclude Plaintiff was not engaged in a protected activity at the time Sgt. Horn allegedly made his threat. During the lunch hour at headquarters on January 9, 2012, Sgt. Horn informed Plaintiff that Cavallaro "put a complaint in that [Plaintiff was] yelling at him" on a train platform during one of their previous encounters. (Davis Dep. 254:14–15.) At that point, Plaintiff claims she told Horn that Cavallaro only submitted a complaint to get back at her for her previously filing complaints against him. Ultimately, Plaintiff was not alleging discrimination

---

[14] I reach the same conclusion as to Plaintiff's complaint about Pearlingi in 2006. (<u>See</u> Pl.'s Ex. 35.)

because of her sex during this conversation with Sgt. Horn. <u>Slagle v. Cnty. of Clarion</u>, 435 F.3d at 266. This generalized allegation of misconduct—not based on a specific protected category— cannot meet the "low bar" that Title VII sets for employees seeking protection. <u>Id.</u> at 268.

Nevertheless, SEPTA does not dispute that Plaintiff was engaged in a protected activity when she reported Szlachta's conduct in June 2011. I thus conclude Plaintiff was engaged in a protected activity when she complained to Sgt. Horn regarding Szlachta's sexually suggestive phone call, and his subsequent statements made during the training sessions at the TSA bunker. Additionally, when viewed in the light most favorable to Plaintiff, I conclude her earlier complaint regarding the "club lock" incident in July 2010 arguably constituted a protected activity as well. Plaintiff alleges that Szlachta left the club lock on the steering wheel knowing that she needed to use that particular police vehicle. (Davis Dep. 188:18–21; 189:19–22.) SEPTA has not produced any evidence to suggest that Szlachta engaged in similar behavior with male officers. Therefore, as to these complaints regarding Szlachta, Plaintiff has satisfied the first element of her prima face case for retaliation.

### ii. Adverse Employment Action

The anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm. <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 67 (2006). An employment action is adverse only if it is "materially adverse" to a reasonable employee such that it "could well dissuade a reasonable worker from making or supporting a charge of discrimination." <u>Id.</u> at 68. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work." <u>Id.</u> at 68. Hence, courts must separate significant from trivial harms as Title VII does not set forth a "general civility code for the American workplace." <u>Oncale</u>, 523 U.S. at 80.

This is an objective standard, and is "phrased in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." Burlington, 548 U.S. at 69.

SEPTA argues that Sgt. Horn's unfulfilled threat does not, as a matter of law, constitute an adverse employment action. (Def.'s Mot. Summ. J. 6–7.) I disagree. Viewed in the light most favorable to Plaintiff, a jury could find that Sgt. Horn's alleged threat that Plaintiff would be "bounced" from the Unit if she did not "get along" with an employee against whom she had previously filed a complaint, could reasonably dissuade or deter an employee in Plaintiff's position from filing any more complaints with SEPTA. As such, Plaintiff has satisfied the second element of her prima facie case.

### iii.  Causal Connection

The third and final element in a retaliation claim requires a showing of causation. "Title VII retaliation claims must be proved according to traditional principles of but-for causation." Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id. at 2533. The Third Circuit considers a "broad array of evidence" in determining whether a plaintiff can establish a sufficient causal link. Farrell, 206 F.3d at 284. "Evidence may include a temporal proximity between the protected activity and the adverse action, antagonistic behavior on the part of the employer, inconsistencies in the employer's articulated reasons for taking the adverse action, or any other evidence that supports an inference of retaliatory animus." Reaves v. Penn. State Police, 597 F. App'x 92, 97 (3d Cir. 2015).

"Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and

defeat summary judgment." <u>LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n</u>, 503 F.3d 217, 232 (3d Cir. 2007). However, where temporal proximity is not "unusually suggestive," courts must ask whether "the proffered evidence, looked at as a whole, may suffice to raise the inference." <u>Id.</u> at 232 (citing <u>Farrell</u>, 206 F.3d at 280). "Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of <u>three</u> <u>months</u> between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." <u>Id.</u> at 233 (emphasis added); <u>see</u> <u>also</u> <u>Yovtcheva v. City of Philadelphia Water Dep't</u>, 518 F. App'x 116, 123 (3d Cir. 2013).

The only complaint Plaintiff filed in which she expressly alleged misconduct based on sexual harassment was in June 2011 regarding Officer Szlachta. Sgt. Horn's alleged threat came on January 9, 2012—roughly seven months after Plaintiff's complaint. Even if I consider her complaint regarding the club lock incident on July 8, 2010 to be a protected activity, there is still a temporal gap of approximately eighteen months. Without more, Third Circuit precedent makes clear that this gap is not "unusually suggestive" of retaliation, and cannot support an inference of causation (i.e., that Horn would not have made this threat but for Plaintiff's complaints). <u>Univ. of Texas Sw. Med. Ctr.</u>, 133 S. Ct. at 2533.

Additionally, there is an absence of direct or circumstantial evidence suggesting a "retaliatory animus" on the part of Sgt. Horn or any other member of SEPTA's upper management during the intervening months between Plaintiff's protected activities and Sgt. Horn's alleged threat. <u>Reaves</u>, 597 F. App'x at 97. Sgt. Horn testified that he instructed Plaintiff to put her complaints "on paper" so that he could run them up the chain of command. He advised Lt. Lawson of Plaintiff's concerns regarding Szlachta's sexually suggestive comments, and Lawson then spoke directly with Szlachta, as did another supervisor. Horn told Cavallaro that if

Cavallaro did not act more professional and modify his behavior, he would be transferred out of the SORT Unit. SEPTA also terminated Szlachta's employment once it concluded he was responsible for the razor blade incident.

The evidence of record does not support the inference that Sgt. Horn or any other supervisor acted with the retaliatory animus or antagonism required when the temporal gap is not unusually suggestive. Krouse, 126 F.3d at 504. Accordingly, Plaintiff has failed to satisfy the third element of her claim. As Plaintiff has failed to establish a prima facie case of retaliation, summary judgment is also appropriate as to Counts III and IV.

**IV.   CONCLUSION**

Plaintiff has failed to establish a prima facie case of either a hostile work environment or retaliation. Therefore, SEPTA's motion for summary judgment will be granted.

An appropriate order follows.